# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH DAKOTA
## CENTRAL DIVISION

GOVERNOR KRISTI NOEM, in her official capacity as the Governor of South Dakota; SOUTH DAKOTA,

*Plaintiffs*,

v.

DEB HAALAND, in her official capacity as United States Secretary of the Interior; and SHANNON A. ESTENOZ, in her official capacity as Principal Deputy Assistant Secretary of the Interior for Fish and Wildlife and Parks; SHAWN BENGE, in his official capacity as acting Director and Deputy Director of Operations of the National Park Service; and HERBERT FROST, in his official capacity as National Park Service Director of the Midwest Region,

*Defendants*.

Case No. ___3:21-cv-3009___

Plaintiffs, Governor Kristi Noem in her official capacity as Governor of South Dakota and the State of South Dakota (the "State"), bring this action under 5 U.S.C. §706 and 28 U.S.C. §1331 and allege as follows:

## INTRODUCTION

1.     Independence Day should "be celebrated" by every generation of Americans "with Pomp and Parade, with Shews, Games, Sports, Guns, Bells, Bonfires and Illuminations from one [e]nd of this Continent to the other." John Adams, *Letter*

- 1 -

*from John Adams to Abigail Adams* (July 3, 1776), *archived at* Massachusetts Historical Society, https://bit.ly/3ahI2Ef.

2.     As a "distinctly national monument," Mount Rushmore National Memorial (the "Memorial") was designed to be "a national shrine to which future generations will repair to declare their continuing allegiance to independence [and] self-government." Calvin Coolidge, *Address at the Opening of Work on Mount Rushmore in Black Hills, SD* (Aug. 19, 1927), *archived at* https://bit.ly/32qBiiZ. Throughout its existence, the Memorial has "celebrated the national history and spirit of democracy during the July 4th holiday." National Park Service, *July 4th Holiday Fireworks Program Environmental Assessment*, 1-3 (April 2003) ("April 2003 Assessment").

3.     The Department of the Interior ("DOI") itself has recognized the "need for the Memorial to host a fun, inspirational, traditional, and educational program celebrating our nation's birthday," through "a marquee event, such as fireworks." *Id.*

4.     Thus, consistent with the Founders' vision for Independence Day commemorations and the purpose of the Memorial itself, the Memorial has hosted safe and responsible Independence Day fireworks shows many times over more than two decades. The events drew thousands of visitors every year and had "a huge impact" on the State's economy and its residents' "sense of pride." Justin Gurley, *Booms, Blasts, and Cracks Heard 'Round the World*, Pennsylvania State University Library Center for the Book, Spring 2010.

5.     Each of the previous four presidential administrations permitted the Memorial to conduct patriotic fireworks shows on Independence Day Weekend; permits were denied only when specifically identified safety risks or logistical roadblocks rendered the shows objectively unsafe or impracticable. Even then, the State and the federal government were in lockstep agreement about the importance of the Memorial's Independence Day celebrations and the necessity of their continued existence. In October 2019, DOI and the State signed a memorandum of understanding to continue the traditional fireworks show in 2020 and the years thereafter.

6.     Just last year, DOI issued the State a permit to hold an outdoor Independence Day celebration at the Memorial. That event was a rousing success, and not a single COVID-19 case was traced back to it.

7.     Unfortunately, the new administration departed from this longstanding precedent and reneged on the agreement without any meaningful explanation. On March 11, 2021, DOI sent the State an abrupt, 620-word letter stating that the Independence Day fireworks show would not be allowed at the Memorial this year. The letter contained no specific factual findings, referenced no implementing laws or governing regulations, and included no discussion of any other objective determinations.

8.     The denial letter was instead a patchwork of vague and speculative purported concerns about: (1) the COVID-19 risk to spectators who would visit the Memorial; (2) the event (paradoxically) preventing "tens of thousands" of others from

visiting the Memorial; (3) tribal leaders' opposition to the event; (4) the potential environmental impact; and (5) a hypothetical conflict with an unidentified construction project scheduled to be completed in June (if that project were to be delayed until July, for some reason). The letter made no attempt to quantify or otherwise characterize the risk level for this year's planned event or how it differed from the risk level for the exact same event last year, which DOI approved.

9.    The reasons DOI did offer were inconsistent with its own regulations, contradicted by the administrative record, and made no attempt to justify DOI's abrupt about-face after its approval of last year's event. Tellingly, none of DOI's explanations were longer than a few sentences or contained any discussion of objective criteria or factual determinations. That is the definition of an arbitrary and capricious agency action under the Administrative Procedure Act ("APA"). *See, e.g.*, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (an agency's failure to "articulate a satisfactory explanation for its action" is arbitrary and capricious). This Court should thus enjoin DOI's denial of the permit and order it to issue a permit for the event expeditiously.

## JURISDICTION AND VENUE

10.    The Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §1331; 5 U.S.C. §§701-06.

11.     Plaintiffs seek declaratory and injunctive relief pursuant to 28 U.S.C. §2201, 28 U.S.C. §2202, and 5 U.S.C. §706.

12.     Venue is proper in this District because a substantial part of the events or omissions giving rise to the claims occurred here. 28 U.S.C. §1391(b)(2).

## PARTIES

13.     Plaintiff Kristi Noem is the sitting Governor of the State of South Dakota. She appears in this matter in her official capacity.

14.     Plaintiff State of South Dakota is home to the Memorial. The State is responsible for the maintenance and development of public lands and infrastructure surrounding the Memorial, and for the economic and general welfare of its residents. The State's economy and public image benefit greatly from the fireworks show itself, from the tourism it attracts to the Memorial, and from the national publicity surrounding this event.

15.     Defendant Deb Haaland is Secretary of the Interior of the United States. Haaland is head of DOI, and responsible for all of its policies and decisions regarding the management and conservation of federal lands and resources in the United States, including the Memorial. Haaland is sued in her official capacity.

16.     Defendant Shannon A. Estenoz is Principal Deputy Assistant Secretary for Fish and Wildlife and Parks at DOI. Estenoz is responsible for DOI's oversight and management of national parks, including the Memorial. Estenoz is sued in her official capacity.

17.     Defendant Shawn Benge is Deputy Director of Operations and the acting Director of the National Park Service ("NPS"). NPS is an agency of DOI. Benge is responsible for overseeing the day-to-day operations of NPS and is responsible for the policies, procedures, and decisions of NPS, including the permit denial at issue in this case. Benge is sued in his official capacity.

18.     Defendant Herbert Frost is the Director of National Park Service Regions 3, 4, and 5. Frost is responsible for the oversight and management of more than sixty national parks in thirteen midwestern states, including the Memorial. Frost is sued in his official capacity.

## BACKGROUND

## I.    The Memorial's Unique Importance to Independence Day Celebrations in the United States

19.     "A visit to Mount Rushmore is a moment of communion with the very soul of America." George H.W. Bush, *Remarks at the Dedication Ceremony of the Mount Rushmore National Memorial in South Dakota* (July 3, 1991). Presidents of all parties have consistently recognized the Memorial as monument of "permanent importance" that future generations would visit to celebrate the liberties enshrined in the Constitution and seek inspiration from the ideals of the American founding. Franklin Delano Roosevelt, *Informal Extemporaneous Remarks By The President: Mount Rushmore National Memorial* (Aug. 30, 1936) (predicting that Americans would visit the Memorial for "thousands and thousands of years" to celebrate their forebearers' efforts "to preserve … a decent form of government to operate under").

20.     And indeed, Americans have done just that. Millions visit the Memorial each year. Many of them do so over the Fourth of July weekend, because "the significance of Independence Day holds special meaning at Mount Rushmore." *Memorandum of Agreement Between the Department of the Interior of the United States of America and the State of South Dakota* 1 (May 6, 2019) ("MOA").

21.     The fireworks show is a crucial, or "marquee," part of that experience. April 2003 Assessment at 1-2. DOI itself has emphasized that "[t]he addition of the fireworks program in 1998" spurred "a substantial increase in the number of visitors to the Memorial and surrounding area." From 1998 to 2009, tens of thousands of Americans across the country traveled to South Dakota to participate in what DOI has described as a "patriotic event that celebrates the best of America and provides an emotional experience for all those who attend." April 2003 Assessment at 3-13.

22.     The fireworks show doesn't just draw visitors to the event, however—it also provides a significant boost to the State's economy and small businesses in other ways. Critically, it burnishes "the image of South Dakota and the Black Hills" by providing "valuable free advertising" about the State "from local, national, and international news coverage of the [event]." April 2003 Assessment at 3-13.

23.     Because the event is watched on television by millions of people in the United States and across the world, the State receives tens of millions of dollars in advertising value that increases tourism to the State both on Independence Day

weekend *and* throughout the rest of the year. That directly leads to significant income for the State's small business and tax revenue for the State and the local governments.

24.    Last year's event, for example, had an advertising value of at least $22 million according to conservative estimates. And Google searches for "Mount Rushmore" during and after the event reached an all-time high—1,250% higher than the previous record—and web traffic to the State's tourism website increased by 872% compared to 2019.

25.    There is no doubt that the event was also an economic lifeline for the nearly 50,000 South Dakotans who work in the State's tourism industry and who were battered by the effects of the COVID-19 pandemic.

26.    The event's popularity is precisely why it was so harmful when the State and DOI jointly decided to cancel the show in 2010 because a rare infestation in the pine forest surrounding the Memorial created a wildfire risk that was "unlike any year before." Rapid City Journal, *Mount Rushmore fireworks canceled* (Jan. 14, 2010), https://bit.ly/2P0b2cd. At that time, both parties expressed confidence that the show would return the following year. *Id.*

27.    Those conditions ultimately persisted for several years and prevented the show from returning quickly. Throughout those years of postponement, however, the State and DOI were aligned in the belief that that the fireworks show was a seminal event for both South Dakota and the nation, and that it should be resumed as soon as feasible.

## II.     The Memorandum of Agreement and Project Agreement to Restore the Memorial's July 4th Fireworks Show

28.     DOI initiated substantive discussions with the State in early 2019 about restarting the traditional fireworks show on Independence Day weekend. Those discussions culminated with DOI and the State signing a memorandum of understanding on May 6, 2019 committing "to exercise their full authorities … to work to return fireworks to [the Memorial] in a safe and responsible manner on July 3, July 4, or July 5, *beginning in the year 2020*." MOA at 2 (emphasis added).

29.     On October 3, 2019, DOI's then-Deputy Assistant Secretary for Fish and Wildlife and Parks Ryan Hambleton sent South Dakota Governor Kristi Noem a draft Project Agreement to renew the fireworks show.

30.     Hambleton "reach[ed] out personally" to Governor Noem "on behalf of DOI in order to be certain" that the State knew "how important" the partnership was to DOI and that DOI "value[d]" the State's "input on this process." MOA at 4.

31.     As part of the Project Agreement, the State committed to use a "GO/NO-GO Checklist" as a "last-minute decision-making tool prior to ignition of the fireworks." Project Agreement, Appendix B. The checklist included eleven separate safety conditions that had to be satisfied before the fireworks show was authorized. Those determinations included whether the Fire Danger Rating was at a level of "concern," whether the wind speed was below the "preferred" level of "less than

10mph for a 10-minute average," and whether the National Weather Service had "predicted red flag warnings" for the show day or the following day. *Id.*

32.     All of the conditions were evaluated within one hour of the scheduled start time, and the event would be canceled if any of the results were not "acceptable." Furthermore, the State was required to present the contents of the checklist and a recommended course of action to the Secretary of the Interior, who held final approval authority for the show.

33.     On July 3, 2020, the State hosted thousands of visitors for its annual Independence Day fireworks show. State and Memorial employees dutifully ensured that all safety measures were properly in place, and the event occurred without incident—as it always has.

### III.   DOI's Pretextual Abandonment of the MOA and Refusal to Permit the 2021 Fireworks Display

34.     On October 19, 2020, the State submitted a new Special Use Permit request to DOI to conduct an Independence Day fireworks show that would be virtually identical to the show DOI had approved the previous year.

35.     The State followed up on that application on December 11, 2020, December 22, 2020, and January 4, 2021 to be sure that DOI had all the information it needed for the event. DOI never asked for any additional information.

36.     As result, and because the 2020 show was conducted successfully with substantially higher risk conditions than the proposed 2021 event, the State assumed

that DOI would continue to operate in good faith under the MOA and approve the request.

37.     But on March 11, 2021, DOI, through a letter from NPS Regional Director Frost, denied the permit request with minimal explanation for the decision.

38.     DOI claimed that it denied the State's request after "careful consideration" of the relevant facts, but the contents of the denial itself suggest otherwise. DOI dispensed with any pretense of engaging in a substantive analysis of the proposed event and instead merely cited an assortment of brief and vaguely worded "concerns" about the State's request.

39.     DOI summarized its conclusions as follows:

> Potential risks to the park itself and to the safety of employees and visitors associated with the fireworks show continue to be a concern and are still being evaluated as a result of the 2020 event. In addition, the park's many tribal partners expressly oppose fireworks at the Memorial. These factors, compiled with the COVID-19 pandemic, do not allow a safe and responsible fireworks show to be held at this site.

Herbert C. Frost, *Letter to Jim Hagan* (Mar. 11, 2021) ("Denial Letter").

40.     On COVID-19, DOI stated that "planning an event of this size and magnitude that draws people from across the country raises very serious concerns about the ability to adhere to Center for Disease Control Guidance," on social distancing.

41.     DOI's conclusion about the purported health risks was premised on its implicit assumption that most spectators would not comply with the federal directive requiring all visitors to wear facemasks at national parks. The letter stated that, at the

fireworks show "last year, most participants were not wearing face coverings." DOI's explanation for that assumption, however, omitted crucial context: *face coverings were not required in federal parks in July 2020*.

42.     In short, DOI treated attendees' failure to follow a rule that did not yet exist in 2020 as evidence that they would not comply with federal health directives issued if the State were allowed to host a fireworks show in 2021. And, in its brief discussion of purported COVID risks, DOI did not even mention the fact that millions of Americans (now 52% of the population) have received COVID vaccines, numbers that will continue to increase rapidly between now and July 4th.

43.     DOI's second justification for the denial was that tribal leaders opposed fireworks at the Memorial, and that it was "committed to respecting tribal connections to the site and building stronger relationships with associated tribes." The letter did not cite any specific example of tribal opposition to fireworks. Indeed, DOI admitted that "the park committed to the 13 affiliated tribes to conduct a Tribal Cultural Sites/Traditional Cultural Properties Survey of the Memorial in 2020," but that survey had been "delayed until summer 2021." And, once again, DOI did not explain what has changed since the 2020 event in terms of tribal leaders' position on the event and why that would justify denying a permit this year after granting one last year.

44.     DOI's third reason for denying the State's permit request was that "[t]he park continues to monitor levels of perchlorates in the water and the potential for wildfire." DOI's discussion of environmental health and safety concerns was limited to

this single sentence. The denial letter failed to specify the nature of the perchlorate and fire risks, quantify the level of risk posed by the fireworks show, or produce any data or otherwise relevant information to support its conclusion. Thus, it is difficult to discern why exactly "the park continu[ing] to monitor levels of perchlorates in the water and the potential for wildfire" precludes the July 2021 fireworks show.

45.    Nor did DOI explain how this explanation was consistent with the 2020 Finding of No Significant Impact ("FONSI"). There, DOI pledged to monitor perchlorate levels in the soil after the 2020 event, and that "[*i*]*f monitoring shows that conditions had changed* meaningfully" after the event, then "additional analysis may be necessary to evaluate future events." FONSI at 3 (emphasis added). There is no evidence in the record that the "conditions had changed meaningfully" since the 2020 event, and DOI certainly did not conduct—or even mention—a subsequent "meaningful analysis" in its 2021 denial letter

46.    DOI's fourth stated reason for denying the permit was that the fireworks show would limit visitor access to the park on Independence Day, thereby preventing "tens of thousands" of people from entering the park on and/or forcing them to cut their visits short. But DOI did not explain how a fireworks show on July 3rd would prevent certain visitors from entering the park on July 4th.

47.    But far more telling is DOI's irreconcilable position on crowds. For purposes of preventing COVID spread, the event cannot go forward because it will attract *too many* people to the park and thus violate social distancing guidelines. But, in

the very same letter, DOI refused to allow the fireworks show because it will result in *too few* visitors to the park, thereby preventing large crowds of "tens of thousands" of people from visiting the Memorial. There is simply no way to square those positions, which is a paradigmatic example of arbitrary decisionmaking.

48.     The final reason DOI gave for denying the State's permit request was that it is "in the final phase of significant construction project in the park" that "is scheduled to be complete in June 2021." But DOI did not identify anything about that project. Nor did it expressly state that the event would cause a delay, much less explain how a *one-day* event in *July* 2021 could delay a project set to be complete a month earlier in *June* 2021.

49.     Despite all this, the State tried to address DOI's alleged concerns and reach a resolution that would allow the event to proceed. On April 13, 2021, Governor Kristi Noem sent an open letter to President Biden with a point-by-point rebuttal of DOI's reasons for denying the State's permit request. Kristi Noem, *Letter to President Joseph R. Biden* (April 13, 2021) ("Noem Letter").

50.     Governor Noem pointed out that on March 11, 2021—the *exact same day* that DOI rejected the July 4th fireworks show because strict social-distancing protocols could still be in force—President Biden addressed the nation from the Oval Office and said that the nation would "mark [its] independence from this virus" by July 4, 2021. Indeed, today—more than two months before the event is scheduled to take place—

more than 200 million shots have been administered and every American over the age of 16 is now eligible to receive a COVID-19 vaccine.

51.     Governor Noem also explained how DOI's analysis is inconsistent with both recent history and the administrative record. DOI claimed that it would be "difficult, if not impossible" to safely conduct the fireworks show under pandemic conditions. But as Governor Noem pointed out, the State held an identical fireworks show for seven thousand people last year under far greater public health threats before a single person had been vaccinated. Yet after "weeks of contact tracing," public health authorities "could not trace a single case of COVID-19 to the event—in South Dakota or in any other state." Moreover, as of the date of the Governor's letter, "roughly 20% of the country is fully vaccinated—and over 50% of South Dakotans have received at least their first shot."

52.     Governor Noem also rebutted DOI's alleged concerns about the event's effect on tribal relations, noting that "the tribes were consulted before last year's event and invited to attend our planning meetings," the "Department of Tribal Relations was involved in every step of the process," and there was "Native American-led programming before the fireworks itself."

53.     Governor Noem also chided DOI for "painting a very misleading picture" when it claimed that tens of thousands of visitors were excluded from the park due to the fireworks show. In fact, "long before the pandemic hit, the State of South Dakota agreed to limit attendance for the fireworks due to previous years' poor crowd control."

54.     Finally, Governor Noem detailed the extensive precautions and procedural safeguards the State and NPS used to ensure that last year's show would "be held safely and responsibly." Those protocols included a "Go/No-Go" chart that listed a comprehensive list of pre-show safety measurements and quality control assessments that had to be met for the show to occur.

55.     DOI, however, was uninterested in any outcome other than the one it had already decreed. Governor Noem did not receive a response, and DOI provided no further clarification or justification for the refusal.

## COUNT I
### Violation of the Administrative Procedure Act
### (Arbitrary and Capricious)
### 5 U.S.C. § 706

56.     Plaintiff repeats and realleges each of the prior allegations in this complaint.

57.     The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). Permitting decisions are agency actions for purposes of the APA and therefore must satisfy the arbitrary and capricious standard. *See McClung v. Paul*, 788 F.3d 822, 828-30 (8th Cir. 2015); *see also Drakes Bay Oyster Co. v. Salazar*, 921 F. Supp. 2d 972, 985 (N.D. Cal. 2013) ("[A] decision not to issue a special use permit constitutes 'agency action' under the APA.").

58.     "To withstand judicial review under this standard, an agency must 'articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Grace Healthcare of Benton v. U.S. Dep't of Health & Hum. Servs.*, 603 F.3d 412, 422 (8th Cir. 2009) (*quoting Motor Vehicle Mfrs.,* 463 U.S. at 42). Agencies must provide such a "reasoned explanation" for their actions "to ensure that all agencies offer genuine justifications for important decisions, reasons that can be scrutinized by the courts and the interested public." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575–76 (2019). Whether an agency decision is justified by a reasoned explanation is determined solely by the agency's "contemporaneous explanations" for the decision. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1909 (2020).

59.     An agency also may not "offer[] an explanation for its decision that runs counter to the evidence before the agency." *Sugule v. Frazier*, 639 F.3d 406, 411 (8th Cir. 2011). And it must "support its predictive judgments" with actual evidence. *Bus. Roundtable v. S.E.C.*, 647 F.3d 144, 1149-50 (D.C. Cir. 2011); *see also Grace Healthcare of Benton*, 603 F.3d at 422 (holding that agency failed to satisfy arbitrary and capricious review where its decision "was based on pure speculation").

60.     In addition, the APA requires that agencies "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). And the agency must "*at least* 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Id.* (emphasis added). That is

because "a reasoned explanation is needed for disregarding facts and circumstances that underlay and were engendered by the prior policy." *Id.*

61.     The vanishingly thin justifications outlined in the Denial Letter do not come close to meeting these standards. DOI's denial of the State's permit request is arbitrary and capricious as a result.

## COUNT II: Congress Unconstitutionally Delegated Legislative Power to NPS (U.S. Const. Art. I, §1; 5 U.S.C. §706)

62.     Plaintiff repeats and realleges each of the prior allegations in this complaint.

63.     Delegations of legislative power are prohibited by "the very first clause of the Constitution, which reads: 'All legislative Powers ... shall be vested in a Congress of the United States.'" *Texas v. United States*, 300 F. Supp. 3d 810, 840 (N.D. Tex. 2018) (quoting U.S. Const. Art. I, §1, cl. 1). "Accompanying that assignment of power to Congress is a bar on its further delegation." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019). Under the non-delegation doctrine, "Congress … may not transfer to another branch 'powers which are strictly and exclusively legislative.'" *Id.* (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825)); *see A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935) ("Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested.").

64.     To that end, Congress cannot simply enact a general policy and then give the agency regulatory *carte blanche* to implement it with regulations. *See, e.g., Schechter*

*Poultry*, 295 U.S. at 541-42. Congress must guide the agency's implementation by setting forth "standards" that are "sufficiently definite and precise to enable Congress, the courts and the public to ascertain whether the [agency] … has conformed to those standards." *Yakus v. United States*, 321 U.S. 414, 426 (1944). In other words, "Congress [must] lay down by legislative act an intelligible principle to which the person or body authorized to [carry out a general policy] is directed to conform …." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

65.     In *Schechter Poultry*, for example, Congress enacted a statute that "authorize[d] the President to approve 'codes of fair competition'" for various industries. 295 U.S. at 521-22. The Supreme Court held that this general provision "supplie[d] no standards for any trade, industry, or activity" to determine what constitutes "fair competition" or to reasonably assess whether the President's "codes" actually implemented that requirement. *Id.* at 541. "Instead of prescribing rules of conduct, it authorize[d] the making of codes to prescribe them." *Id.* This effectively gave the President "virtually unfettered" authority to "enact[] laws for the government of trade and industry throughout the country." *Id.* at 542.

66.     The statutes authorizing DOI to issue regulations that govern its permitting authority are no different. The regulations governing DOI's issuance of permits are 36 C.F.R. §§1.6, 2.38, 2.5. DOI relies on three statutory provisions for issuing those regulations: 54 U.S.C. §§100101, 100751, 320102. *See* Technical Edits,

Department of the Interior, 80 Fed. Reg. 36,474, 36,476 (June 25, 2015). None provide DOI with an intelligible principle.

67.     Section 100101 is hardly more than a general statement introducing the concept of the NPS. It provides that the NPS shall "promote and regulate the use of the National Park System" in a manner meant "to conserve … the System units and to provide for the enjoyment of the scenery, natural and historical objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." And Section 100751 provides only that "[t]he Secretary shall prescribe such regulations as the Secretary considers necessary or proper for the use and management of System units." *See* 54 U.S.C. §100751(a).

68.     Courts have already recognized these statutes provide DOI with no meaningful guardrails on the regulations that it can issue. *See, e.g.*, *Sierra Club v. Andrus*, 487 F. Supp. 443, 448 (D.D.C. 1980) ("However, nowhere … is there a specific direction as to how the protection of Park resources and their federal administration is to be effected."); *S. Utah Wilderness All. v. Dabney*, 222 F.3d 819, 826 (10th Cir. 2000) ("Neither the word 'unimpaired' nor the phrase 'unimpaired for the enjoyment of future generations' is defined in the Act. It is unclear from the statute itself what constitutes impairment, and how both the duration and severity of the impairment are to be evaluated or weighed against the other value of public use of the park").[1]

--------

[1] NPS originally claimed permitting authority under now-defunct 16 U.S.C. §§1, 3. *See General Regulations for Areas Administered by the National Park Service*, 48 FR 30252-01 (June 30,

69.     That leaves Section 320102. That section has the advantage of actually mentioning NPS's permitting authority. But it does so in terms that give DOI no objective, workable principle on the scope of the regulations it can issue to govern that authority.

70.     It provides that DOI shall "operate and manage" the national parks "for the benefit of the public," and it can grant "permits for use of the land … when necessary or desirable either to accommodate the public or to facilitate administration." 54 U.S.C. §320101(i). Congress provided no guidance on what constitutes "for the benefit of the public" or when a permit would be "necessary or desirable" for managing the parks. The statute thus allows DOI to issue whatever regulations it pleases to govern its permitting authority without running afoul of Section 320102.

71.     These statutes are not "sufficiently definite to enable … courts and the public to ascertain whether [DOI]" is operating pursuant to any "standards," *Yakus*, 321 U.S. at 426. Rather than actually establish any Congressional "standards of legal obligation," *Schechter Poultry*, 295 U.S. at 530, the statutes allow DOI to enact an infinite array of its own rules, all of which could be justified as "necessary or proper" to "promote and regulate the use of the National Park System … to provide for the

---

1983). NPS issued updated regulations governing its permitting authority to account for Congress recodifying NPS-specific statutes into Title 54 in 2014. *See* Technical Edits, 80 Fed. Reg. at 36,474; *see also High Point, LLP v. NPS*, 850 F.3d 1185, 1199 (11th Cir. 2017).

enjoyment" of the national parks "in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. §§100101, 100751.

72.    "Instead of prescribing rules of conduct," then, the statutes DOI relies on only "authorize[] the making of codes to prescribe them." *Schechter Poultry*, 295 U.S. at 541-42. They violate the non-delegation doctrine as a result.[2]

**WHEREFORE**, Plaintiffs respectfully requests that this Court enter judgment in favor of Plaintiffs and against Defendant and provide the following relief:

A.    A declaratory judgment that the Department of the Interior's denial of South Dakota's permit request was arbitrary and capricious;

B.    A declaratory judgment that the statutes granting DOI permitting authority are unconstitutional for want of an intelligible principle to guide DOI's issuance of regulations that govern that authority;

C.    A preliminary injunction finding the Department of the Interior's denial of South Dakota's permit request invalid, setting it aside, and ordering it to issue the requested permit; and

---

[2] A majority of the Supreme Court has signaled a renewed interest in addressing cases that involve such improper delegations of legislative authority to agencies. *See Gundy v. United States*, 139 S. Ct. 2116, 2130-31 (2019) (Alito, J., concurring in the judgment) ("If a majority of this Court were willing to reconsider the approach we have taken for the past 84 years, I would support that effort."); *id.* at 2133-42 (Gorsuch, J., dissenting, joined by Roberts, C.J., and Thomas, J.); *Paul v. United States*, 140 S. Ct. 342 (2019) (Kavanaugh, J., respecting denial of cert.) ("Justice Gorsuch's scholarly analysis of the Constitution's nondelegation doctrine in his *Gundy* dissent may warrant further consideration in future cases.").

D.      All other relief to which Plaintiff is entitled, including but not limited to attorneys' fees and costs.

Respectfully submitted,

Dated: April 30, 2021          */s/Katie Hruska*

Katie Hruska, (S.D. Bar. No. 4596)
Mark Miller (*pro hac vice* application forthcoming)
Special Assistant Attorney General
Office of the Governor
500 East Capitol Avenue
Pierre, SD 57501
(605) 773-5999
Katie.Hruska@state.sd.us
Mark.Miller@state.sd.us


Jeffrey M. Harris (*pro hac vice* application forthcoming)
Bryan K. Weir (*pro hac vice* application forthcoming)
James F. Hasson (*pro hac vice* application forthcoming)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com
bryan@consovoymccarthy.com
james@consovoymccarthy.com

JS 44   (Rev. 04/21)                      **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| Kristi Noem, in her official capacity as Governor of South Dakota; and South Dakota | Deb Haaland, in her official capacity as United States Secretary of the Interior, et al. |

**(b)**  County of Residence of First Listed Plaintiff    Hughes County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Washington, D.C.
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)**  Attorneys *(Firm Name, Address, and Telephone Number)*

Katie Hruska, South Dakota Office of the Governor, 500
E. Capitol Avenue Ave., Pierre, SD 57501, 605-773-3212

Attorneys *(If Known)*

**II.  BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government
Plaintiff
- [x] 3  Federal Question
*(U.S. Government Not a Party)*
- [ ] 2  U.S. Government
Defendant
- [ ] 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

**III.  CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

**IV.  NATURE OF SUIT** *(Place an "X" in One Box Only)*                                    Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane   [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal | [ ] 376 Qui Tam (31 USC |
| [ ] 130 Miller Act | [ ] 315 Airplane Product     Product Liability |  | 28 USC 157 | 3729(a)) |
| [ ] 140 Negotiable Instrument | Liability   [ ] 367 Health Care/ |  | **INTELLECTUAL** | [ ] 400 State Reapportionment |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel &     Pharmaceutical |  | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| & Enforcement of Judgment | Slander     Personal Injury |  | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers'     Product Liability |  | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted | Liability   [ ] 368 Asbestos Personal |  | [ ] 835 Patent - Abbreviated | [ ] 460 Deportation |
| Student Loans | [ ] 340 Marine     Injury Product |  | New Drug Application | [ ] 470 Racketeer Influenced and |
| (Excludes Veterans) | [ ] 345 Marine Product     Liability |  | [ ] 840 Trademark | Corrupt Organizations |
| [ ] 153 Recovery of Overpayment | Liability   **PERSONAL PROPERTY** |  | [ ] 880 Defend Trade Secrets | [ ] 480 Consumer Credit |
| of Veteran's Benefits | [ ] 350 Motor Vehicle   [ ] 370 Other Fraud | **LABOR** | Act of 2016 | (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle   [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards |  | [ ] 485 Telephone Consumer |
| [ ] 190 Other Contract | Product Liability   [ ] 380 Other Personal | Act | **SOCIAL SECURITY** | Protection Act |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal     Property Damage | [ ] 720 Labor/Management | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | Injury   [ ] 385 Property Damage | Relations | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ |
|  | [ ] 362 Personal Injury -     Product Liability | [ ] 740 Railway Labor Act | [ ] 863 DIWC/DIWW (405(g)) | Exchange |
|  | Medical Malpractice | [ ] 751 Family and Medical | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** | Leave Act | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights   **Habeas Corpus:** | [ ] 790 Other Labor Litigation |  | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting   [ ] 463 Alien Detainee | [ ] 791 Employee Retirement | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment   [ ] 510 Motions to Vacate | Income Security Act | [ ] 870 Taxes (U.S. Plaintiff | Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/     Sentence |  | or Defendant) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | Accommodations   [ ] 530 General |  | [ ] 871 IRS—Third Party | [x] 899 Administrative Procedure |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities -   [ ] 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
|  | Employment   **Other:** | [ ] 462 Naturalization Application |  | Agency Decision |
|  | [ ] 446 Amer. w/Disabilities -   [ ] 540 Mandamus & Other | [ ] 465 Other Immigration |  | [ ] 950 Constitutionality of |
|  | Other   [ ] 550 Civil Rights | Actions |  | State Statutes |
|  | [ ] 448 Education   [ ] 555 Prison Condition |  |  |  |
|  | [ ] 560 Civil Detainee - |  |  |  |
|  | Conditions of |  |  |  |
|  | Confinement |  |  |  |

**V.  ORIGIN** *(Place an "X" in One Box Only)*

- [x] 1  Original
Proceeding
- [ ] 2  Removed from
State Court
- [ ] 3  Remanded from
Appellate Court
- [ ] 4  Reinstated or
Reopened
- [ ] 5  Transferred from
Another District
*(specify)*
- [ ] 6  Multidistrict
Litigation -
Transfer
- [ ] 8  Multidistrict
Litigation -
Direct File

**VI.  CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
5 U.S.C. §706; 28 U.S.C. §1331
Brief description of cause:
Violation of Administrative Procedure Act

**VII.  REQUESTED IN
COMPLAINT:**

- [ ] CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   [ ] Yes   [ ] No

**VIII.  RELATED CASE(S)
IF ANY**

*(See instructions):*     JUDGE _____   DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 04/30/2021 | /s/ Katie Hruska |

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**    **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)**    **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)**    **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**    **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
   United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
   United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
   Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
   Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.)**

**III.**    **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**    **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**    **Origin.** Place an "X" in one of the seven boxes.
   Original Proceedings. (1) Cases which originate in the United States district courts.
   Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
   Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
   Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
   Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
   Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
   Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
   **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.**    **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**    **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
   Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
   Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**    **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.