UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| GOVERNOR KRISTI NOEM, in her official capacity as the Governor of South Dakota; and THE STATE OF SOUTH DAKOTA, | 3:21-CV-03009-RAL |
| Plaintiffs, | |
| vs. | **OPINION AND ORDER DENYING PRELIMINARY INJUNCTION MOTION** |
| DEB HAALAND, in her official capacity as United States Secretary of the Interior; SHANNON A. ESTENOZ, in her official capacity as Principal Deputy Assistant Secretary of Interior for Fish and Wildlife and Parks; SHAWN BENGE, in his official capacity as acting Director and Deputy Director of Operations of the National Park Service; and HERBERT FROST, in his official capacity as National Park Service Director of the Midwest Region, | |
| Defendants, | |
| and | |
| CHEYENNE RIVER SIOUX TRIBE, and its Tribal Historic Preservation Officer STEVE VANCE, | |
| Intervenor/Defendants. | |

A fireworks display at Mount Rushmore on July 3, on first blush, seems like a good way to celebrate the Independence Day weekend. This country could use a good celebration of its foundational principles of democracy, liberty, and equal protection of law, after a pandemic that has disrupted society and business and has killed nearly 600,000 United States citizens to date, after an insurrection and physical incursion of the United States Capitol while Congress was

1

convening to certify the outcome of the presidential election, and after this nation has become so sadly divided by the politicization of so many issues, likely to include even the outcome of this case. The United States would benefit immensely from greater unity in its efforts to continually form a more perfect union. So a national show of unity and celebration, such as a fireworks display at Mount Rushmore for Independence Day, is appealing. However, this Court is not called upon to determine whether such a fireworks display is a good idea. It would be improper judicial activism for this Court to disregard settled law establishing the arbitrary and capricious standard for review of the fireworks permit denial and to mandate issuance of such a permit. Accordingly, this Court must deny the requested injunctive relief in this case.

Governor Kristi Noem, in her official capacity as Governor of the State of South Dakota, along with the State of South Dakota (collectively referred to as "the State") filed a lawsuit against numerous federal officials (collectively referred to as "the Federal Defendants") after the National Park Service (NPS) denied the State's request for a special use permit to conduct a fireworks event at Mount Rushmore on July 3, 2021. Doc. 1. The State seeks what is considered a mandatory preliminary injunction, akin to a writ of mandamus, to require the NPS to grant the special use permit. Doc. 3. The Federal Defendants oppose any preliminary injunction, invoke the doctrine of laches, and defend the decision to deny the special use permit. Doc. 34. The Cheyenne River Sioux Tribe and its Tribal Historic Preservation Officer Steve Vance (collectively referred to as "the Tribal Defendants") filed a motion to intervene in this action, Doc. 30, which this Court granted, Doc. 43. The Tribal Defendants assert that this Court lacks subject matter jurisdiction and that the NPS's denial of the permit is not subject to judicial review. Seventeen attorneys general have filed an amicus brief supporting the State's position. Doc. 51. For the reasons explained herein, this Court concludes that it has subject matter jurisdiction, that the NPS special

use permit denial is a final agency action subject to review, and that the doctrine of laches does not bar the State's claims. However, the State has not met the requirements for the extraordinary remedy of a mandatory injunction or writ of mandamus, so this Court must deny the motion for preliminary injunction.

I.    Facts

Mount Rushmore National Memorial lies in the central Black Hills of South Dakota. The Black Hills is an isolated mountain range of tremendous scenic beauty covering nearly two million acres. Doc. 3-2 at 13. To the State, the Black Hills is the premier destination driving the State's tourism industry, which employs some 50,000 South Dakotans and is the second largest industry next to agriculture in the State. Doc. 3-4 at ¶ 10. The State has a strong economic interest in attracting visitors to enjoy the many activities, tourist sites, businesses, and attractions that the Black Hills offers. Doc. 3-4. To the Tribal Defendants and the Lakota peoples, the Black Hills, known as Paha Sapa, is the sacred center of the world, integral to Lakota traditional spiritual practices, and part of the lands the Lakota negotiated to preserve as exclusively their own in the Fort Laramie Treaty of 1868. Though that Treaty preserved the Black Hills as part of the Great Sioux Indian Reservation, a gold rush beginning in the 1870s resulted in abrogation of the Treaty and dispossession of the Black Hills from the Lakota, which ninety years later prompted the Supreme Court of the United States to observe: "A more ripe and rank case of dishonorable dealings will never, in all probability, be found in our history . . . ." United States v. Sioux Nation of Indians, 448 U.S. 371, 388 (1980) (citation omitted).

Sculptor Gutzon Borglum engaged in an audacious and amazing project beginning in 1927 and through 1941 to carve enormous busts of George Washington, Thomas Jefferson, Theodore Roosevelt, and Abraham Lincoln into a mountain side at what is known as Mount Rushmore.

3

Mount Rushmore, a one-of-a-kind marvel, attracts many visitors annually and is a symbol of national pride, honoring four of the greatest presidents in the history of the United States. The Lakota sentiment toward the carvings runs the gamut from inspiring feelings of patriotic pride to a sense of desecration of their sacred land and the mountain they call Six Grandfathers.[1]

Mount Rushmore came under the stewardship of the NPS in 1933, when sculpting the mountain was still ongoing. Mount Rushmore National Memorial ("the Memorial" or "the park") contains 1,278 acres, including the massive granite outcrops, intermingled with old growth ponderosa pine forest. The land within the Memorial contains wildlife, streams, wetlands, flora, and fauna, representing five different biomes. Doc. 35 at ¶ 3. The Memorial's grounds contain evidence of human habitation and development for thousands of years, from the earliest stone tools of tribal populations to some of the first homesteads in the Black Hills. Doc. 35 at ¶ 3. Within the Memorial are historic sites related to the mining boom and early development and tourism of the park. Doc. 35 at ¶ 3. The Memorial borders on the Black Elk Wilderness Area, the Peter Norbeck Wildlife Preserve, the Hell Canyon and Mystic Districts of the Black Hills National Forest, as well as some private land including land adjacent to the town of Keystone. Doc. 3-2 at 13.

The Fourth of July, our nation's Independence Day, commemorates the signing of the Declaration of Independence in July of 1776 whereby the original thirteen colonies declared independence from Great Britain. Washington and Jefferson of course were central figures in the

---

[1]Native Americans do not lack patriotism; Native peoples in the United States, for instance, have had the highest per-capita involvement of any population in military service. www.nicoa.org/american-indian-veterans-have-highest-record-of-military-service/. However, the history of the treatment of American Indians in North America has a great deal of misfortune and tragedy to it. The Native American view of the Founding Fathers is justifiably complicated. An outline of American Indian history for those who wish to better understand why many Native Americans have such complicated feelings is attached to United States v. Erickson, 436 F. Supp. 3d 1242, 1259–1272 (D.S.D. Jan. 28, 2020), aff'd, No. 20-1861, 2021 WL 2212699 (8th Cir. June 2, 2021).

4

American Revolution, with Jefferson drafting the Declaration of Independence and Washington leading the new nation's military against the British in the war for independence and later serving as the first president of the United States after the Constitution's ratification in 1789.  Many people visit Mount Rushmore over the Independence Day weekend as a way to observe and celebrate the Fourth of July by viewing with patriotic pride the sculptures, which include two of this nation's founding fathers.

Fireworks displays throughout the United States have become a traditional way of celebrating the Fourth of July and Independence Day weekend.  Starting in 1998 and continuing for eleven consecutive years (except for in 2002 when there was an elevated fire risk), the Memorial had annual fireworks displays to celebrate Independence Day.  The fireworks display attracted many people to the Memorial and grew in popularity as a way of observing the Fourth of July and feeling patriotic pride.

The NPS stopped the annual fireworks display for several reasons, including that the event had become a chaotic "free-for-all" with far more people attending than the Memorial could handle.  Doc. 35-2 at 29.  The Memorial's parking lot with 1,100 parking spaces would be full by 9:00 a.m., people would arrive at the Memorial as early as 6:00 a.m. to camp out and hang around all day, and roughly 8,000 people would crowd into the developed area of the Memorial.  Doc. 35-2 at 29–32.  Other visitors ended up in restricted areas or in positions where they could not even see the fireworks display, the number of visitors complicated emergency vehicle access, and trash accumulated both from the all-day visitors and from the fireworks themselves.  Doc. 35-2 at 29–32.  In 2001, over 30,000 people flooded the Memorial to watch the fireworks display.  Doc. 3-2 at 13.  Over the course of years, eighteen wildfires started as a result of the fireworks displays, although those generally were quickly suppressed with just two acres of the Memorial burning as

5

a result. Doc. 3-2 at 13. In April of 2003, the NPS issued a very detailed environmental assessment of Independence Day fireworks at the Memorial, including an exhaustive listing of the pros and cons, as well as discussing the safer alternative of a laser light show. Doc. 3-2 at 5–74. Meanwhile, the Black Hills itself was undergoing environmental changes, with a multi-year drought and the mountain pine beetle Dendroctonus ponderosae infestation, killing pine trees and providing tinder for wildfires. Thus, the fireworks display to commemorate the Fourth of July ceased after 2009.

After a ten-year hiatus, the State and the Department of Interior (DOI) began discussing in early 2019 the possibility of fireworks for Independence Day returning to the Memorial. Doc. 3-3 at 2. On May 6, 2019, the State and DOI entered into a Memorandum of Agreement under which they "committed to an agreement to exercise their full authorities under State and Federal law to work to return fireworks to Mount Rushmore National Memorial in a safe and responsible manner on July 3, July 4, or July 5, beginning in the year 2020." Doc. 3-2 at 76–77. The NPS completed an environmental assessment in April of 2020 concerning the proposed resumption of the fireworks display. Doc. 3-2 at 108–142.

The NPS, on June 15, 2020, issued a Special Use Permit to the State "to hold an event for up to 10,000 ticketed and VIP participants at [the Monument] on July 3, 2020, which includes a pyrotechnic (fireworks) display." Doc. 35-14. Specific Condition 20 of the Special Use Permit stated in part: "Issuance of this permit is for the current year 2020 and does not mean an automatic renewal of the event in the future." Doc. 35-14 at 4. As part of the Project Agreement, the State committed to use a "GO/NO-GO Checklist" designed to mitigate fire risks, and the State took other measures designed to assure a safe event. Doc. 3-3 at 2–5. The cost of the event, described as "approximately $787,000 [and] expected to reach $800,000," was divided between the NPS contributing $350,000 and the State an amount not to exceed $500,000. Doc. 3-2 at 84. The

President of the United States and about 7,500 others attended the event. Doc. 3-4 at 2; Doc. 35 at 5. The State's Secretary of Tourism estimates that the advertising value of the event was at least $22 million and cites an all-time high for Google searches for "Mount Rushmore" during and after the event, as well as dramatically increased web traffic to the State's tourism website.[2] Doc. 3-4 at 2. The State documented no cases of spread of COVID-19 from the event.

On October 19, 2020, the State submitted a new application for a special use permit to the NPS to have a fireworks display around Independence Day 2021. Doc. 3-2 at 93–94. There were some email exchanges between the State and NPS, but little activity on the permit application in 2020. Doc. 3-2 at 96–98. The NPS Regional Director affirms in an affidavit that the State's application prompted discussions among federal officials at the local, regional, and national levels, with the involvement of subject matter experts. Doc. 35 at 5.

On March 11, 2021, the NPS Regional Director sent a two-page letter to the State denying the grant of a special use permit. Doc. 3-2 at 101–102. The letter contains five reasons for denial of the permit, which are quoted in this section but discussed factually at length later in this opinion and order. The first such reason related to concerns of spread of COVID-19, on which the Regional Director wrote:

> The health and safety of the public and our employees remain the highest priority for the National Park Service. While we have recently been seeing encouraging progress in combating the COVID-19 pandemic, the situation remains dynamic and it is only prudent to make plans based on the best available science and public health guidance available today. As the nation continues to respond to the ongoing COVID-19 pandemic, planning an event of this size and magnitude that draws people from across the country raises very serious concerns about the ability to adhere to Center (sic) for Disease Control guidance which currently recommends that large gatherings be avoided, particularly those in which physical social

---

[2]Part of what drove this sort of web traffic likely was the attendance in 2020 of the President of the United States at the fireworks event and the resulting news coverage.

7

> distancing cannot be maintained between people who live in
> different households. With an event this size it would be difficult,
> if not impossible, to comply with social distancing protocols if they
> continue to be in place in early July. Also, as we saw last year, most
> participants were not wearing face coverings, which now are
> required in all national parks where physical distancing cannot be
> maintained.

Doc. 3-2 at 101. The second reason for the permit denial related to tribal concerns, on which the

Regional Director wrote:

> In addition, the park's many tribal partners expressly oppose
> fireworks at the Memorial... [W]e are committed to respecting tribal
> connections with the site and building stronger relationships with
> associated tribes. The park committed to the 13 affiliated tribes to
> conduct a Tribal Cultural Sites / Traditional Cultural Properties
> Survey of the Memorial in 2020; however, due to the pandemic it
> has been delayed until summer 2021.

Doc. 3-2 at 101. The third reason for the permit denial centered on two environmental concerns:

"The park continues to monitor levels of perchlorates in the water and the potential for wildfire."

Doc. 3-2 at 102. The fourth reason for the denial was: "The 2020 event was limited in attendance

due to safety concerns which consequently impacted tens of thousands who were not able to visit

the memorial or had their visit cut short." Doc. 3-2 at 102. And the fifth and final ground for

denial involved disruption of construction at the park:

> Also, we are in the final phase of a significant construction project
> in the park. While the work is scheduled to be complete in June
> 2021, any delay in the project would result in the work not being
> complete by July. A second demobilization to accommodate an
> event would be costly to the agency and impact the visiting public
> further based on the 2020 experience.

Doc. 3-2 at 102. The letter concluded by expressing that the NPS valued its relationship with the

State and wished to work with the State on other plans to commemorate the nation's history. Doc.

3-2 at 102.

The State contests the validity of these grounds to refuse issuing the permit.  On April 13, 2021, the State's Governor sent a three-page letter to the President of the United States noting that the very day of March 11 when the NPS issued the denial letter, the President had said:

> [B]y July the 4th, there's a good chance you, your families, and friends will be able to get together in your backyard or in your neighborhood and have a cookout and a barbeque and celebrate Independence Day . . . After this long hard year, that will make this Independence Day something truly special, where we not only mark our independence as a nation, but we begin to mark our independence from this virus.

Doc. 3-2 at 104.  The State's Governor wrote that the 2020 display was done in a safe and effective manner, detailed the precautions taken, referenced the April of 2020 environmental assessment, and asserted that the State had consulted with the nine tribes within its state boundary before the 2020 event and would do so again.  Doc. 3-2 at 104–107.  The State seeks to have this Court reverse the permit denial and direct that a special use permit enter.

The Tribal Defendants in their intervention criticize the State for attempting to elevate "a holiday party" over what the Tribal Defendants regard as their constitutional and statutory religious liberties as well as safety interests.  Doc. 37 at 6.  The Tribal Defendants make two arguments that the Federal Defendants do not—that this Court lacks subject matter jurisdiction and that the NPS's denial is not final agency action from which the State can seek relief.  The Tribal Defendants join with the Federal Defendants in defending the denial of the permit as not being arbitrary and capricious, emphasizing in particular the Tribe's religious and cultural interest in the area and the ongoing process under the National Historic Preservation Act to identify sites within the Memorial of traditional, cultural and in turn historical significance.  Doc. 37.  The Federal Defendants raise a laches defense, argue that the permit denial was based on good reason and thereby was not

arbitrary and capricious, and assert that the State cannot at any rate justify the extreme relief of a writ of mandamus or mandatory injunction. Doc. 34.

The State's arguments include that the March 11 denial is not a reasoned explanation, that the Federal Defendants are now offering altered explanations to justify denial of the permit, that the grounds for denial were arbitrary and capricious, and that this Court should reverse the NPS's decision because otherwise the NPS could run out the clock on the time remaining before the Independence Day weekend. Docs. 3, 49. Seventeen state attorneys general have filed an amicus brief echoing the State's position. Doc. 51.

## II.   Standard for Considering Motion for Preliminary Injunction

Rule 65(a) of the Federal Rules of Civil Procedure governs entry of a preliminary injunction. A preliminary injunction is considered an "extraordinary remedy never awarded as of right." Benisek v. Lamone, 138 S. Ct. 1942, 1943 (2018) (per curiam) (citation omitted). In determining whether to grant a preliminary injunction, this Court considers the factors set forth in Dataphase Systems, Inc. v. CL Systems, Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc): (1) the movant's probability of success on the merits; (2) the threat that the movant will suffer irreparable harm in the absence of relief; (3) the balance of that harm against the injury that granting the preliminary injunction will inflict on the nonmovant; and (4) the public interest. Mgmt. Registry, Inc. v. A.W. Cos., 920 F.3d 1181, 1183 (8th Cir. 2019); South Dakota v. Frazier, 4:20-CV-03018-RAL, 2020 WL 6262103, at *3 (D.S.D. Oct. 23, 2020). The movant, here the State, bears the burden of proving these factors. CDI Energy Servs. v. West River Pumps, Inc., 567 F.3d 398, 402 (8th Cir. 2009) (citation omitted).

That burden becomes that much heavier when the movant is seeking affirmative relief as the State does in this case. Unlike the sort of preliminary injunction sought here, a typical

preliminary injunction is "prohibitory," and "merely freezes the positions of the parties until the court can hear the case on the merits." Heckler v. Lopez, 463 U.S. 1328, 1333 (1983). In other words, a preliminary injunction is usually meant only to "preserve the relative positions of the parties until a trial on the merits can be held." Ahmad v. City of St. Louis, 995 F.3d 635, 641 (8th Cir. 2021) (quoting Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981)). Even so, such a typical preliminary injunction is considered an "extraordinary remedy." Benisek, 138 S. Ct. at 1943 (per curiam); Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003).

But where the injunction, like the one requested by the State, is "mandatory . . . like a mandamus," such relief should be granted sparingly. Heckler, 463 U.S. at 1333 (citation omitted). Such injunctions are never granted as a matter of right, but rather in the exercise of sound judicial discretion. Id. (citation omitted). The burden on the movant is particularly demanding for a mandatory injunction because "granting the preliminary injunction will give the movant substantially the relief it would obtain after a trial on the merits." United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1179 (8th Cir. 1998) (cleaned up and citation omitted). This Court must exercise its discretion with "caution," and grant the preliminary injunction only if the movant has shown that "the balance of other factors tips *decidedly* toward the movant." Id. (emphasis added) (citation omitted).

## III.   Discussion

### A. The State is unlikely to succeed on the merits.

Although no single Dataphase factor is determinative, the Eighth Circuit has emphasized that "the probability of success factor is the most significant." MPAY Inc. v. Erie Custom Comput. Applications, Inc., 970 F.3d 1010, 1015 (8th Cir. 2020) (cleaned up and citation omitted). The defendants assert two general arguments why the State's case should not even be considered on

11

the merits. First, the Tribal Defendants assert that this Court lacks subject matter jurisdiction over the case. Second, the Federal Defendants assert that the State's claims are barred by laches. Finally, the Federal Defendants, echoed by the Tribal Defendants, argue that Congress's delegation of authority to the NPS is constitutional, that the agency action at issue was not arbitrary and capricious or contrary to law, and thus that the State's case will fail on the merits.

### 1. This Court has subject matter jurisdiction.

Before considering the merits of the State's claims, this Court must ensure that it has the jurisdiction to do so. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101 (1998) (reaffirming that jurisdiction is a prerequisite to determining the merits of the case). As such, the Tribal Defendants' argument on subject matter jurisdiction must be addressed first. The State alleges that this Court has subject matter jurisdiction under 28 U.S.C. § 1331 to hear its claims arising under the Administrative Procedure Act (APA). Doc. 1 at ¶ 10. However, the Tribal Defendants argue that the APA deprives this Court of the power to hear the case for two reasons: (1) the challenged action is committed solely to agency discretion; and (2) the challenged decision did not constitute a final agency action.[3]

First, the Tribal Defendants argue that issuing special use permits are decisions committed solely to the NPS's discretion. Under the APA, there is "a basic presumption of judicial review for one suffering legal wrong because of agency action." Dep't of Homeland Sec. v. Regents of the Univ. of California, 140 S. Ct. 1891, 1905 (2020) (cleaned up and citation omitted); see also Tamenut v. Mukasey, 521 F.3d 1000, 1003 (8th Cir. 2008) (per curiam). That presumption can only be overcome by showing that a statute precludes judicial review, 5 U.S.C. § 701(a)(1), or that

---

[3]The Federal Defendants do not raise either of these arguments.

12

the decision is committed to agency discretion, id. § 701(a)(2). The latter exception is at issue here.

To honor the presumption of judicial review, the Supreme Court has emphasized that the exception in § 701(a)(2) should be read "quite narrowly." Regents of the Univ. of Cal., 140 S. Ct. at 1905 (quoting Weyerhaeuser Co. v. United States Fish and Wildlife Serv., 139 S. Ct. 361, 370 (2018)). The Supreme Court has instructed that the § 701(a)(2) exception applies only in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Dep't of Com. v. New York, 139 S. Ct. 2551, 2568 (2019) (cleaned up and citations omitted). The Eighth Circuit has further explained that "even a decision that is wholly discretionary by statute may be reviewed [under the APA] if regulations or agency practice provide standards by which an agency's conduct may be judged." Abdelwahab v. Frazier, 578 F.3d 817, 821 n.6 (8th Cir. 2009) (quoting Spencer Enters., Inc. v. United States, 345 F.3d 683, 691 (9th Cir. 2003)); see also Tamenut, 521 F.3d at 1004 (considering whether either the statute or regulation provided a meaningful standard against which to judge the agency's exercise of discretion).

The NPS's decision not to issue a special use permit is not one of "those rare administrative decisions traditionally left to agency discretion." Regents of the Univ. of Cal., 140 S. Ct. at 1905 (cleaned up and citation omitted). Here, there is a meaningful standard against which to judge the agency's exercise of discretion. The NPS has promulgated regulations in accordance with 54

13

U.S.C. §§ 100101(a)[4] and 100751(a)[5].  The regulation concerning the issuing of permits sets forth

the factors the superintendent must consider in deciding whether to issue a permit.  The regulation

provides in relevant part:

> [T]he superintendent may issue a permit to authorize an otherwise
> prohibited or restricted activity or impose a public use limit.  The
> activity authorized by a permit shall be consistent with applicable
> legislation, Federal regulations and administrative policies, and
> based upon a determination that public health and safety,
> environmental or scenic values, natural or cultural resources,
> scientific research, implementation of management responsibilities,
> proper allocation and use of facilities, or the avoidance of conflict
> among visitor use activities will not be adversely impacted.

36 C.F.R. § 1.6(a).  In turn, § 1.6(c) states that "the superintendent shall deny a permit that has

been properly applied for only upon a determination that the designated capacity for an area or

facility would be exceeded; or that one or more of the factors set forth in paragraph (a) [of § 1.6]

would be adversely impacted."  See also 36 C.F.R. § 2.50[6].  The regulations articulate the grounds

---

[4]Section 100101(a) states, "The Secretary, acting through the Director of the National Park
Service, shall promote and regulate the use of the National Park System by means and measures
that conform to the fundamental purpose of the System units, which purpose is to conserve the
scenery, natural and historic objects, and wildlife in the System units and to provide for the
enjoyment of the scenery, natural and historic objects, and wildlife in such manner and by such
means as will leave them unimpaired for the enjoyment of future generations."
[5]Section 100751 states, "The Secretary shall prescribe such regulations as the Secretary considers
necessary or proper for the use and management of System units."
[6]Although none of the parties involved in this case cited 36 C.F.R. § 2.50 in their briefing, this
regulation discusses the issuing of permits for special events.  Section 2.50 provides:

> (a) Sports events, pageants, regattas, public spectator attractions,
> entertainments, ceremonies, and similar events are allowed:
> Provided, however, there is a meaningful association between the
> park area and the events, and the observance contributes to visitor
> understanding of the significance of the park area, and a permit
> therefor has been issued by the superintendent.  A permit shall be
> denied if such activities would:
> (1) Cause injury or damage to park resources; or
> (2) Be contrary to the purposes for which the natural, historic,
> development and special use zones were established; or
> unreasonably impair the atmosphere of peace and tranquility

14

on which a permit request can be denied.  In other words, the NPS's discretion is not so broad that it can deny a permit request for any reason at all; rather, at least one of the factors listed in § 1.6 must be implicated.  As such, the NPS's decision to deny the permit request is not the kind of agency decision that was meant to be precluded from review under 5 U.S.C. § 701(a)(2). [7]

Second, the Tribal Defendants contend that the NPS's denial letter did not constitute a final agency action.  The APA authorizes judicial review of "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704; Sierra Club v. U.S. Army Corps of Engineers, 446 F.3d

---

> maintained in wilderness, natural, historic, or commemorative zones.
> (3) Unreasonably interfere with interpretive, visitor service, or other program activities, or with the administrative activities of the National Park Service; or
> (4) Substantially impair the operation of public use facilities or services of National Park Service concessioners or contractors; or
> (5) Present a clear and present danger to the public health and safety; or
> (6) Result in significant conflict with other existing uses.

36 C.F.R. § 2.50(a).

[7]The Tribal Defendants cite Drakes Bay Oyster Co. v. Salazar, 921 F. Supp. 2d 972 (N.D. Cal. 2013), in arguing that there are no meaningful standards by which to judge the NPS's exercise of discretion.  That case involved a unique congressional enactment authorizing the NPS to issue a single ten-year special use permit for oyster farming to a single company at a single location. Id. at 977–78, 988.  The congressional enactment did not provide the NPS with any criteria for deciding whether to grant or deny the special use permit. Id. at 980.  Further, the NPS never promulgated any regulations in accordance with that congressional enactment. Id. at 987 n.14. The company argued that § 1.6 provided NPS with guidance in its decision; however, the court rejected that argument because § 1.6 governs permit decisions generally and was not applicable to the unique congressional enactment at issue in that case. Id. at 988–99.  The court went on to hold that it was left without meaningful guidance to determine whether the NPS abused its discretion in denying that company its special use permit for oyster farming, and therefore, the case was unreviewable under the APA. Id. at 990.  The case at hand is distinguishable because it does not involve issuing a special use permit under a unique congressional enactment, and as such, § 1.6 is applicable here.  Indeed, the court in Drakes Bay Oyster recognized that where the federal agency has promulgated regulations setting forth the factors under which the decision to issue a permit should be made, the court does have a meaningful standard by which to judge the agency's exercise of discretion and can review its decisions under the APA. Id. at 787 (citing KOLA, Inc. v. United States, 882 F.2d 361 (9th Cir. 1989)).

808, 813 (8th Cir. 2006). An agency decision is considered "final" when two conditions are met: (1) the action marks the consummation of the agency's decision-making process, meaning that the decision is not merely tentative or interlocutory in nature, and (2) the action is one by which rights or obligations have been determined, or from which legal consequences will flow. U.S. Army Corps of Engineers v. Hawkes Co., Inc., 136 S. Ct. 1807, 1813 (2016) (quoting Bennett v. Spear, 520 U.S. 154, 177–78 (1997)). "[I]f the agency has issued 'a definitive statement of its position, determining the rights and obligations of the parties,' that action is final for purposes of judicial review." Sierra Club, 446 F.3d at 813 (quoting Bell v. New Jersey, 461 U.S. 773, 779–80 (1983)).

Here, the Tribal Defendants argue that the State failed to exhaust its administrative remedies. In particular, the Tribal Defendants posit that the State could have appealed the decision to the Director of the NPS instead of writing a letter to the President of the United States. The Tribal Defendants assert that the State's failure to appeal to the proper authorities deprives this Court of the power to review the case.

"Under the APA, administrative exhaustion is required when it is mandated by statute or agency rule." Conservation Force v. Salazar, 919 F. Supp. 2d 85, 89 (D.D.C. 2013) (citing Darby v. Cisneros, 509 U.S. 137, 146 (1993)). Neither the statute nor regulations set forth an appeal process for the denial of a special use permit, and no party has cited to any statute or regulation or caselaw requiring such an appeal. This Court has examined other subparts within Chapter I of Title 36 of the Federal Code of Regulations. In subparts elsewhere in the chapter, the NPS has clearly articulated an appeal process relating to other kinds of decisions. Yet no such appeal process is found in Subpart 1 or Subpart 2, the subparts concerning the issuing of permits. See 36 C.F.R. §§ 1.6, 2.50. That the NPS has not set forth an appeal process indicates that the denial itself is meant to be a final agency action. See Yousuf v. Samantar, 451 F.3d 248, 251 (D.C. Cir. 2006)

("An agency's denial of a request is final agency action for the purpose of § 704."); S. Forest

Watch, Inc. v. Jewell, No. 3:13-CV-116-JMH-HBG, 2014 WL 1207734, at *8 n. 1 (E.D. Tenn.

Mar. 24, 2014) (noting that the plaintiffs were not required to exhaust their administrative remedies

in challenging the NPS's online permit system because neither the statutes nor regulations require

exhaustion before pursuing judicial review). Further, the denial letter, Doc. 3-2 at 101–02,

constitutes a "definite statement of [the NPS's] position," Sierra Club, 446 F.3d at 813 (quoting

Bell, 461 U.S. at 779–80), and is not interlocutory or tentative in nature, id. The letter determines

the State's right, or here lack of right, to conduct a fireworks event at Mount Rushmore, and legal

consequences flow from that decision. Id. In sum, the denial letter is a final agency action.

Therefore, this Court has subject matter jurisdiction over this case.

### 2. The State's claims are not barred by laches.

The Federal Defendants argue that the State is unlikely to prevail on the merits because its

claims are barred by laches. Whether the defense of laches applies is an appropriate consideration

in evaluating the movant's likelihood of success on the merits. Hubbard Feeds, Inc. v. Animal

Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999); see also Benisek, 138 S. Ct. at 1944

("A party requesting a preliminary injunction must generally show reasonable diligence."). Laches

is an equitable remedy to be applied "when a claimant inexcusably delays in asserting its claim

and thereby unduly prejudices the party against whom the claim ultimately is asserted." Hubbard

Feeds, Inc., 182 F.3d at 602. Whether laches applies is in the sound discretion of the district court.

Brown-Mitchell v. Kansas City Power & Light Co., 267 F.3d 825, 827 (8th Cir. 2001).

Here, the Federal Defendants point out that the State could have brought its claims sooner.

The NPS denied the application for a special use permit on March 11, 2021. Doc. 3-1 at 15.

Instead of immediately pursuing this case, one month after the denial letter, on April 13, the State's

Governor chose to write a letter to the President instead. Doc. 3-1 at 17. On April 30, the State filed this action along with its motion for preliminary injunction. Docs. 1, 3. When the State filed this action and the motion for preliminary injunction, nearly seven weeks had passed since the NPS denied the State its permit—nearly half of the then-remaining time before July 4. The Federal Defendants argue that they are unduly prejudiced by this delay because if the Court were to grant the preliminary injunction, it "would face the nearly impossible task of preparing for this major event in about four weeks." Doc. 34 at 22.

The State responds that the NPS is to blame for the delay. The State points out that it filed its permit request on October 19, 2020. Doc. 3-1 at 15; Doc. 49 at 7. The State followed up with the NPS, which at no point requested any additional information from the State. Doc. 3-1 at 15. The NPS waited almost five months after the State's application to issue the denial letter. Doc. 3-1 at 15; Doc. 49 at 7. The State argues that any prejudice that the NPS may now face is of its own doing. Doc. 49 at 7 ("DOI sat on its hands for nearly five months before denying the permit with virtually no explanation. DOI now claims that it is too late for this Court to offer any meaningful relief, but this Court should not allow DOI to evade its obligations under the APA by merely running out the clock.").

Ultimately, neither side has been perfectly diligent, and the delay by the Federal Defendants in considering the permit application was longer than that by the State in bringing the action to challenge the permit denial. This Court declines to apply the doctrine of laches to foreclose the State's request for injunctive relief.

### 3. Congress's delegation of authority to the NPS is constitutional.

Because there is subject matter jurisdiction and the State's claims are not barred by laches, this Court now turns to analyzing the merits of the State's claims under the first Dataphase factor.

18

One of the claims asserted in the State's complaint is that Congress unconstitutionally delegated legislative power to the NPS. The State does not argue this claim in support of its motion for preliminary injunction. See Docs. 3, 3-1, 49. As such, the Federal Defendants assert that this claim should be afforded no weight in considering the State's likelihood of success on the merits. Doc. 37 at 34. A party's failure to make an argument in its brief may constitute waiver of that argument. United States v. Cooper, 990 F.3d 576, 583 (8th Cir. 2021); Eckert v. Titan Tire Corp., 514 F.3d 801, 805 n.2 (8th Cir. 2008). However, the State did assert this claim in its Complaint, and if the claim has validity, then the State is likely to prevail on the merits. As it turns out, the State's non-delegation claim finds virtually no support in existing law, which perhaps explains why the State did not argue it in briefing.

Under the non-delegation doctrine, Congress may not delegate to another branch "powers which are strictly and exclusively legislative." Gundy v. United States, 139 S. Ct. 2116, 2123 (2019) (citation omitted). However, the Constitution does not "deny to the Congress the necessary resources of flexibility and practicality that enable it to perform its functions." Id. (cleaned up and citation omitted). Indeed, Congress may enlist the help of other branches. Mistretta v. United States, 488 U.S. 361, 372 (1989). In particular, Congress "may confer substantial discretion on executive agencies to implement and enforce laws." Gundy, 139 S. Ct. at 2123. This is based on the recognition that "in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." Mistretta, 488 U.S. at 372.

Thus, whether Congress has unconstitutionally delegated its legislative power or merely conferred discretion on the executive branch to implement and enforce its law turns on whether Congress has supplied an "intelligible principle" to guide the delegee's use of discretion. Gundy,

19

139 S. Ct. at 2123.  The Supreme Court has explained that "a delegation is permissible if Congress

has made clear to the delegee the general policy he must pursue and the boundaries of his

authority."  Id. at 2129 (cleaned up and citation omitted).  This standard is not demanding.  Id.

Indeed, only twice in history has the Supreme Court ever found that Congress unconstitutionally

delegated its power to the executive branch.  Id. (citation omitted).  Both instances occurred in

1935, in A. L. A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935) and Panama

Refining Co. v. Ryan, 293 U.S. 388 (1935), where the Supreme Court found that "Congress had

failed to articulate any policy or standard to confine discretion."  Gundy, 139 S. Ct. at 2129

(cleaned up and citation omitted).  The Supreme Court has since "over and over upheld even very

broad delegations."  Id.  The Supreme Court has provided the following examples:

> We have approved delegations to various agencies to regulate in the
> "public interest."  We have sustained authorizations for agencies to
> set "fair and equitable" prices and "just and reasonable" rates.  We
> more recently affirmed a delegation to an agency to issue whatever
> air quality standards are "requisite to protect the public health." And
> so forth.

Id. (citations omitted).

Against this backdrop, Congress's delegation to the NPS passes muster.  Congress's core

mandate to the NPS, 54 U.S.C. § 100101, provides as follows:

> (a)     In general.—The Secretary, acting through the Director of
> the National Park Service, shall promote and regulate the use of the
> National Park System by means and measures that conform to the
> fundamental purpose of the System units, which purpose is to
> conserve the scenery, natural and historic objects, and wildlife in the
> System units and to provide for the enjoyment of the scenery, natural
> and historic objects, and wildlife in such manner and by such means
> as will leave them unimpaired for the enjoyment of future
> generations.
>
> (b)     Declarations.—
>
> (1)     1970 declarations.—Congress declares that—

(A) the National Park System, which began with establishment of Yellowstone National Park in 1872, has since grown to include superlative natural, historic, and recreation areas in every major region of the United States and its territories and possessions;

(B) these areas, though distinct in character, are united through their interrelated purposes and resources into one National Park System as cumulative expressions of a single national heritage;

(C) individually and collectively, these areas derive increased national dignity and recognition of their superb environmental quality through their inclusion jointly with each other in one System preserved and managed for the benefit and inspiration of all the people of the United States; and

(D) it is the purpose of this division to include all these areas in the System and to clarify the authorities applicable to the System.

(2) 1978 reaffirmation.—Congress reaffirms, declares, and directs that the promotion and regulation of the various System units shall be consistent with and founded in the purpose established by subsection (a), to the common benefit of all the people of the United States. The authorization of activities shall be construed and the protection, management, and administration of the System units shall be conducted in light of the high public value and integrity of the System and shall not be exercised in derogation of the values and purposes for which the System units have been established, except as directly and specifically provided by Congress.

The statute provides an "intelligible principle" in Subpart (a), stating that regulations shall conform to the purpose, which is "to conserve the scenery, natural and historic objects, and wildlife in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wildlife in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). The other relevant statute, 54 U.S.C. § 100751, empowers the NPS to "prescribe regulations" for the management of System units under the mandate of § 100101. Thus, the delegation to the NPS passes constitutional muster because it conveys Congress's general policy that the NPS regulate the use of the national parks with the

goals of conservation of the scenery, natural and historic objects, and wildlife in order to preserve them for future generations. Stated another way, there is an "intelligible principle" to guide the NPS in issuing special use permits. The State appears to have no chance to prevail on its non-delegation claim.

### 4. The NPS's decision was not arbitrary and capricious.

This Court next turns the State's main claim in this case. The State alleges that the NPS's decision to deny the permit request was arbitrary and capricious. The Federal Defendants, joined by the Tribal Defendants, argue that the State is unlikely to succeed on the merits because the agency action at issue was not arbitrary and capricious. Under 5 U.S.C. § 706, the reviewing court shall:

> (1)     compel agency action unlawfully withheld or unreasonably delayed; and

> (2)     hold unlawful and set aside agency action, findings, and conclusions found to be—

> (A)     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Here, the State asks this Court to first hold unlawful and set aside the NPS's denial of the special use permit as "arbitrary and capricious" under § 706(2) and then compel the NPS to grant the special use permit under § 706(1). The State's requested remedy frames two issues: (1) whether the NPS's decision to deny the special use permit was arbitrary and capricious, and (2) if the decision was arbitrary and capricious, whether this Court should compel the NPS to grant the permit.

This Court first considers whether the NPS's decision to deny the permit was arbitrary and capricious. The APA permits a federal district court to set aside a federal agency decision if that decision is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A); <u>Regents of the Univ. of Cal.</u>, 140 S.

Ct. at 1905. This is considered a narrow standard of review, Regents of the Univ. of Cal., 140 S.

Ct. at 1905 (citation omitted), as courts must be "highly deferential" to the agency under this

standard, Org. for Competitive Markets v. U.S. Dep't of Agric., 912 F.3d 455, 459 (8th Cir. 2018);

Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric., 566 F. Supp. 2d 995, 997 (D.S.D.

2008) (citation omitted), especially when dealing with matters within the agency's expertise,

Mausolf v. Babbitt, 125 F.3d 661, 667 (8th Cir. 1997).

A court should not substitute its judgment for that of the agency. F.C.C. v. Fox Television

Stations, Inc., 556 U.S. 502, 513–14 (2009) (citation omitted). It is not the court's job to consider

"whether a regulatory decision is the best one possible or even whether it is better than the

alternatives." F.E.R.C. v. Elec. Power Supply Ass'n, 577 U.S. 260, 292 (2016). Rather, a court

must restrict its analysis to whether the agency's decision was based on relevant factors and was a

clear error of judgment. Regents of the Univ. of Cal., 140 S. Ct. at 1905 (citation omitted). As

part of this limited inquiry, a court should examine whether the agency offered an explanation for

its decision that runs counter to the evidence before the agency, or is so implausible that it could

not be ascribed to a difference in view or the product of agency expertise." Sugule v. Frazier, 639

F.3d 406, 411 (8th Cir. 2011) (cleaned up and citation omitted). At a minimum, an agency must

provide "a satisfactory explanation for its actions based on relevant data." Niobrara River Ranch,

L.L.C. v. Huber, 373 F.3d 881, 884 (8th Cir. 2004) (citing Motor Vehicle Mfrs. Ass'n of U.S., Inc.

v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 30 (1983)); see also Encino Motorcars, LLC v.

Navarro, 136 S. Ct. 2117, 2125 (2016). Although courts cannot "supply a reasoned basis for the

agency's action that the agency itself has not given," Mausolf, 125 F.3d at 667 (quoting Bowman

Transp., Inc. v. Arkansas–Best Freight Sys., Inc., 419 U.S. 281, 285–86 (1974)), courts should

"uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned,"

Fox Television, 556 U.S. at 513–14 (citation omitted).   "If an agency's determination is supportable on *any* rational basis," then a court must uphold it. Org. for Competitive Markets, 912 F.3d at 459 (citation omitted) (emphasis added).

Here, the NPS denied the permit request for five reasons. First, the NPS was concerned about the risk that a large gathering during the COVID-19 pandemic would pose to the health and safety of the public and its employees. Doc. 3-2 at 101. Second, the NPS was committed to strengthening its relationship with the Tribes and completing a Tribal Cultural Sites / Traditional Cultural Properties Survey before approving a fireworks event. Doc. 3-2 at 101. Third, the NPS was concerned about increased levels of perchlorates in the water and the potential for wildfire. Doc. 3-2 at 102. Fourth, the NPS explained that the 2020 fireworks event prevented tens of thousands from visiting the Memorial or cut their visit short. Doc. 3-2 at 102. Finally, the NPS noted that there is ongoing construction at the Memorial that may not be completed by July and would be costly to pause so that the fireworks event could take place. Doc. 3-2 at 102.

To evaluate whether such reasons provide a "satisfactory explanation"[8] for the NPS's decision, Huber, 373 F.3d at 884, this Court will focus on three questions: (1) whether the reasons were proper considerations under 36 C.F.R. §§ 1.6(a) and 2.50; (2) whether the reasons are based on relevant data or instead run counter to the evidence before the NPS; and (3) whether the reasons are rational or instead so implausible that they could not be ascribed to a difference in view or the product of expertise. Of course, "[i]f the agency's decision is supportable on *any* rational basis,

---

[8]The State attacks the brevity of the denial letter and asserts that the NPS is providing new justifications in giving more details to this Court. Doc. 49 at 8–14. The NPS's denial letter may offer "less than ideal clarity [but] the agency's path may reasonably be discerned" from the two-page letter. Fox Television, 556 U.S. at 513–14. The NPS submitting an affidavit providing what information it had when denying the application does not constitute a change in the reasons for denial.

the court must uphold it." Foster v. Vilsack, 820 F.3d 330, 333 (8th Cir. 2016) (citation omitted) (emphasis added).[9]

The first reason for denial in the March 11 letter concerned health and safety surrounding the risk of COVID-19 spread, which dovetails with the language in § 1.6(a) and § 2.50(a)(5) that a determination on a permit application consider "public health and safety." The concern about COVID-19 spread, from the perspective of someone writing on March 11, 2021, was very real and based on relevant data; the Federal Defendants have filed documents reflecting that there were "high transmission" and "substantial transmission" rates in the Black Hills area in March of 2021. Doc. 35-9. This nation, very fortunately, is in a much better position in dealing with the COVID-19 pandemic today than it was in March of 2021, with vaccination rates continuing to rise and accordingly infection and death rates continually lowering. Since March of 2021, the Centers for Disease Control and Prevention has revised guidance to allow vaccinated individuals to congregate, and an outdoor gathering of vaccinated individuals poses virtually no risk of COVID-19 spread. Unvaccinated individuals can mitigate their risk of contracting the virus by mask wearing and physical distancing, and, thanks in large measure to those who got vaccinated, are at a lower risk for contracting the virus now than in March of 2021. If COVID-19 concerns were the NPS's only reason for the permit denial, this Court would be tempted to remand the decision for two reasons: (1) the outdoor event at the Memorial last year appears to have been relatively safe;

---

[9]In its reply brief, the State argues that if *any* of NPS's five proffered reasons are arbitrary and capricious, then the decision itself is arbitrary and capricious. Doc. 49 at 8–9. In support of this argument, the State cites two cases from the D.C. Circuit, Nat'l Fuel Gas Supply Corp. v. F.E.R.C., 468 F.3d 831 (D.C. Cir. 2006), and Mid-Tex Elec. Co-op., Inc. v. F.E.R.C., 773 F.2d 327, 353 (D.C. Cir. 1985). However, Eighth Circuit precedent controls here, and the Eighth Circuit has repeatedly emphasized that a court must uphold an agency decision if there is any rational basis for it. See Org. for Competitive Markets, 912 F.3d at 459; Foster, 820 F.3d at 833; Voyageurs Nat. Park Ass'n v. Norton, 381 F.3d 759, 763 (8th Cir. 2004).

and (2) this nation has made such dramatic progress in just the last few months in combatting the pandemic that an assessment of health and safety from March 2021 is outdated now. Still, a court reviewing an agency decision must limit its inquiry to "the administrative record that was before the agency when it made its decision." Norton, 381 F.3d at 766 (citation omitted). In March of 2021, the NPS had information suggesting ongoing high to substantial spread of COVID-19 in the Black Hills area, although the President's remarks indicate that he in March of 2021 had hopes that the pandemic would allow for barbeque gatherings for the Fourth of July. From the perspective of March of 2021, the concern about COVID-19 spread from a gathering of some 7,000 to 10,000 people at the Memorial was rational, even if a similar gathering a year prior had been relatively safe. The health and safety concerns are less compelling now, and there are more grounds for denial to consider.

The second reason for the NPS's permit denial relates to tribal concerns. Some additional facts deserve mention to describe what the NPS knew at the time of the denial. Under 54 U.S.C. § 306108, commonly referred to as § 106 of the National Historic Preservation Act, the NPS had invited 20 tribal nations to consult prior to the proposed fireworks event that ultimately took place in 2020. Doc. 35-6. Eleven tribes responded in opposition to the proposed fireworks at the Memorial, either in writing or by attending a consultation meeting. Doc. 35 at 6–7; Doc. 35-2; Doc. 35-3; Doc. 35-4; Doc. 35-5; Doc. 35-6; Doc. 35-7; Doc. 35-8. During one of the consultation meetings, the NPS invited tribal historic cultural preservation officers to do an on-site Tribal Cultural Properties (TCP) survey to identify significant tribal cultural resources in the park. A 2006-2008 archeological survey of the Memorial had identified two prehistoric cultural sites and an isolated artifact listed as a prehistoric lithic found within the Memorial's boundaries. Doc. 35-3 at 117–25. During the tribal consultation, the tribes raised thirteen separate concerns, Doc. 35-

26

3; Doc. 34 at 10–11, and then felt betrayed when during the tribal consultation in 2020 over whether any fireworks display at the Memorial should occur, the President announced that there would be a "big fireworks display" at the Memorial for Independence Day in 2020, Doc. 35-3; Doc. 34 at 9. The planned TCP survey was delayed due to the COVID-19 pandemic, had not been completed when the NPS denied the 2021 permit application, and is to be completed in spring and summer of 2021. Doc. 35 at 7. Section 1.6(a) authorizes consideration of "cultural resources" and "management responsibilities" in deciding whether NPS should grant a permit, and § 2.50(a)(2) directs denying a permit that would "unreasonably impair the atmosphere of peace and tranquility maintained in . . . natural, historic, or commemorative zones." There is some data supporting the tribal concerns for their cultural sites within the Memorial, and this Court cannot say that NPS's choice to honor those tribal concerns as one ground for permit denial was not rational, or was so implausible that it could not be ascribed to a genuine difference of view.

The third basis cited by the NPS for permit denial was environmental concerns about perchlorate levels and wildfire risk. The 2020 precautions of a GO/NO-GO procedure and stationing of fire suppression services address some of the wildfire risk, but the Federal Defendants note that the Black Hills remains in a drought, that the Wildland Fire Potential Outlook issued in March of 2021 characterizes that the Black Hills area of western South Dakota is in severe drought, and that such conditions exert extreme pressure on firefighting personnel and equipment. Doc. 35 at 14. This concern cannot be dismissed as not rational or implausible, as there is evidence supporting it, as well as a history of eighteen, thankfully all small and quickly contained, wildfires at the Memorial from past fireworks displays. Doc. 3-2 at 13.

An additional explanation of what the NPS knew about perchlorate contamination at the time of the permit denial is warranted here. The United States Geological Survey ("the Survey")

27

in 2011 detected high levels of perchlorate—a contaminant that can cause human thyroid dysfunction—in soils, surface water, and groundwater at the Memorial. Doc. 35 at 10; Doc. 35-1. The fireworks events between 1998 and 2009 were the most probable source for perchlorate contamination. Doc. 35-1 at 30. The Survey stated: "The potential exists that the levels of [perchlorate] in drinking water could become elevated following a fireworks display, especially when considering the existing levels of perchlorate in the Memorial's drinking water." Doc. 35-1 at 32. The Environmental Protection Agency (EPA) Drinking Water Health Advisory level for perchlorate is 15 ppb, and the perchlorate levels at the Memorial have been continually monitored since 2013 with levels generally declining over the years of no fireworks displays from around 29 ppb to a low of 12 ppb. Doc. 35 at 10–11. After the 2020 fireworks event at the Memorial, the perchlorate level in drinking water increased at some sites within the Memorial, and at the time the permit was denied in March of 2021 remained above the EPA health advisory level. Doc. 35 at 11; Doc. 35-11. Accordingly, this third basis for denial finds roots in § 1.6(a)'s criteria of "public health and safety [and] environmental . . . values," as well as § 2.50(a)(5)'s criteria of "public health and safety." There is some data to support connecting the increase in perchlorate levels in drinking water at the Memorial to fireworks displays. The decision to deny the permit on this basis cannot be characterized as not rational or so implausible not to be ascribed to a genuine difference in view.

The fourth reason given for denial of the permit was that the fireworks display would disrupt enjoyment of the Memorial by others. The State noted the incongruity between the NPS's first concern about overcrowding during the pandemic and this concern that the fireworks display keeps people away. What seems incongruous at first is made clear in information provided by the Federal Defendants and available to them in their decision making. The Memorial historically

hosts between 20,000 and 39,000 visitors on July 3.[10]   Doc. 35 at 12.   Those who visit the

Memorial typically stay perhaps a couple of hours, to stroll the Avenue of Flags, view the

impressive sculpture from the terrace, read and view education displays, walk around the site and

the "Presidential Trail" to the base of the mountain, visit the sculptor's studio, and stop at the gift

shop.   Very few visitors would ever stay an entire day at the Memorial, though those arriving

nearer to dusk often remain to see the lighting ceremony.   As described earlier in this opinion and

order, when there were fireworks displays prior to 2010, people were arriving as early as 6:00 a.m.,

filling up the parking lot by 9:00 a.m., and jamming up the park all day, preventing normal

visitation of the site.   Doc. 35-2 at 29–32.   The State for the 2020 Presidential visit and fireworks

display restricted access to around 7,500 people, and the permit the State sought for the event in

2021 contemplated no more than 10,000 people.   Despite this sound crowd management decision

by the State in 2020, the NPS reported a decline in visitation of the Memorial on July 3, 2020.[11]

Doc. 35-12; Doc. 34-16.   Part of § 1.6(a) contemplates considering whether "management

responsibilities, proper allocation and use of facilities, or the avoidance of conflict among visitor

use activities will not be adversely impacted."   Similarly, § 2.50(a) directs permit denial if the use

would "[u]nreasonably interfere with interpretive, visitor service, or other program activities" or

"[s]ubstantially impair the operation of public use facilities or services," or "[r]esult in significant

conflict with other existing uses."   36 C.F.R. § 2.50(a)(3),(4),(5).   Thus, consideration on the

impact on other visitors is legitimate under §§ 1.6(a) and 2.50(a).   The NPS has data on visitor

numbers, and this ground for denial appears to be rational.   This Court cannot help but think that

---

[10]July 3 is the date the State had the 2020 fireworks display and proposed to have the 2021 display.
[11]The decline could be related to less tourist activity generally in the Black Hills during the pandemic, but that is unclear in the record.

there could be some accommodation, for instance, where the Memorial is open to regular visitors until 6:00 p.m., and those arriving for fireworks cannot enter the parking area or park before 7:30 or 8:00 p.m., to allow the usual flow of visitors throughout the morning and afternoon. But it is not for a court, ill-positioned to know about road or parking congestion or necessary setup time and event management, to devise a solution to legitimate concerns that an agency has in denying a permit.

The fifth and final reason given for denial was disruption of construction inside the Memorial. In 2019, the NPS began an extensive construction project at the Memorial including replacement of the plaza paver walkway system through the Avenue of Flags, with a widening of the existing walkway. The 2020 event caused damage from too much weight on concrete that had not cured long enough. The cost of replacement concrete is estimated at $60,000 and work is ongoing presently with the concrete to be replaced in June. A repeat of the same damage to the newly poured concrete could occur from a one-time gathering of some 7,500 or more people at the Memorial. Doc. 35 at 9. Under § 1.6(a), a worry about repeating a construction project multiple times is a "management responsibility," and § 2.50 supports permit denial where the activity would "[c]ause injury or damage to park resources." The concern about disruption of the construction is rational based on the damage to the concrete caused during the 2020 event and thus not implausible. Again, this Court would think that there could be a way to work around the issue, but that is not the role of a court judging whether an agency decision is arbitrary and capricious. See Mausolf, 125 F.3d at 668 ("Consistent with the NPS's responsibility to manage and regulate Park resources, the NPS has been given wide latitude to make management decisions regarding the type and scope of activities permitted on Park property.").

The State argues that even if there is a rational basis for the decision, the NPS's decision is nonetheless arbitrary and capricious because the NPS did not "explain why it changed positions from last summer when it approved a substantially similar event." Doc. 3-1 at 24. When an agency changes its existing position, it must "display awareness that it is changing position" and "show that there are good reasons for the change in policy." Encino, 136 S. Ct. at 2126; Fox Television, 556 U.S. at 515. However, the agency need not demonstrate that "the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." Lion Oil Co. v. E.P.A., 792 F.3d 978, 983 (8th Cir. 2015) (quoting Fox Television, 556 U.S. at 515).

At issue in Encino was a regulation that the Department of Labor had adopted in 2011 which reversed a position the Department had held since 1978. 136 S. Ct. at 2123–24. In ruling that the Department's decision was arbitrary and capricious, the Supreme Court explained that "[a] summary discussion may suffice in other circumstances, but [in this case]—in particular because of decades of industry reliance on the Department's prior policy—the explanation fell short of the agency's duty to explain why it deemed it necessary to overrule its previous position." Id. at 2126.

Here, the State argues that the NPS had an existing policy of allowing a fireworks event at Mount Rushmore during Independence Day weekend. To support this argument, the State points to a 2019 Memorandum of Agreement between the DOI and the State. Doc. 3-2 at 76–77. In that agreement, the State and the DOI agreed "to exercise their full authorities under State and Federal law to work to return fireworks to Mount Rushmore National Memorial in a safe and responsible manner on July 3, July 4, or July 5, beginning in the year 2020." Doc. 3-2 at 77. The Federal Defendants, on the other hand, argue that Encino and Fox Television Stations are not applicable

here because those cases involved regulations or guidance documents. As such, there has not been the kind of change in policy contemplated by the Supreme Court. This Court agrees. The NPS's denial of the 2021 permit after it granted the 2020 permit is not the sort of a change in policy requiring fuller explanation as to the reason for the change. But, in any event, the NPS acknowledged the 2020 event in its letter and explained some of the problems that arose from having the event and how those issues factored into its decision. See Doc. 3-2 at 101 ("Potential risks to the park itself and to the health and safety of employees and visitors associated with the fireworks demonstration continue to be a concern and are still being evaluated as a result of the 2020 event."); id. ("Also, as we saw last year, most participants were not wearing face coverings, which are now required in all national parks where physical distancing cannot be maintained."); id. at 102 ("The 2020 event was limited in attendance due to safety concerns which consequently impacted tens of thousands who were not able to visit the memorial or had their visit cut short."); id. ("A second demobilization [of the ongoing construction project] to accommodate an event would be costly to the agency and impact the visiting public further based on the 2020 experience."). In sum, this Court cannot say that NPS's decision was arbitrary and capricious under § 706(2).

### 5. The State is not entitled to the mandatory injunctive relief sought.

Even if the NPS's decision somehow were arbitrary and capricious, the State has failed to establish that it is entitled to the relief sought. The APA, codified at 5 U.S.C. § 706(1), provides, "The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." Norton v. S. Utah Wilderness All., 542 U.S. 55, 62 (2004); Flandreau Santee Sioux Tribe v. United States Dep't of Agric., No. 4:19-CV-04094-KES, 2019 WL 2394256, at *2 (D.S.D. June 6, 2019). The Eighth Circuit has found that relief under § 706(1) is akin to a writ of

mandamus. <u>Org. for Competitive Markets</u>, 912 F.3d at 462; <u>Flandreau Santee Sioux Tribe</u>, 2019 WL 2394256, at *2.   Relief under § 706(1), like a writ of mandamus, is considered "an extraordinary remedy reserved for extraordinary situations." <u>Org. for Competitive Markets</u>, 912 F.3d at 462.

The Supreme Court has held that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." <u>Norton</u>, 542 U.S. at 64.   Under this rule, relief under § 706(1) is only available when the federal agency has failed to take some action. <u>Id.</u> at 62. The Supreme Court has clarified that a "failure to act" is not the same thing as a "denial." <u>Id.</u> at 63. A "denial" is the agency's way of saying "no" to a request whereas a "failure to act" is simply the omission of an action without formally rejecting a request. <u>Id.</u> Section 706(1) relief is limited to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." <u>Id.</u> at 66.

This is not an extraordinary situation in which relief under § 706(1) is warranted.   Relief under § 706(1) is only appropriate where the federal agency has failed to take a discrete action that it is legally required to take. <u>Norton</u>, 542 U.S. at 64. The NPS did not fail to take action here. Rather, the NPS did take action; it denied the State's permit request. As the Supreme Court has made clear, there is an important distinction between the failure to act and a denial. <u>Id.</u> at 63. The "extraordinary remedy" afforded under § 706(1) is not available when a federal agency merely denies a request. Thus, even if the State had established that the NPS's decision were arbitrary and capricious, this Court is precluded from granting the State the relief it seeks. For these reasons, this Court concludes that the State is unlikely to prevail on the merits of its claims.

**B.  The remaining <u>Dataphase</u> factors do not alter the outcome.**

Having concluded that the State is unlikely to prevail on the merits and is seeking a form of injunctive relief the Court cannot grant under the circumstances, this Court considers the remaining <u>Dataphase</u> factors.  This Court determines that the remaining <u>Dataphase</u> factors favor the State, but do not tip so "decidedly" as to justify the injunctive relief sought.  <u>Clorox Co.</u>, 140 F.3d at 1179.  Indeed, the failure to show a likelihood of success on the merits, "by itself strongly suggests that preliminary injunctive relief should be denied." <u>MPAY Inc.</u>, 970 F.3d at 1021 (cleaned up and citation omitted).

The second <u>Dataphase</u> factor is the threat that the movant will suffer irreparable harm in the absence of relief.  "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." <u>Lewis</u>, 346 F.3d at 844.  To show irreparable harm, the movant must show that "the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." <u>Iowa Utils. Bd. v. F.C.C.</u>, 109 F.3d 418, 425 (8th Cir. 1996).  The movant must demonstrate that the irreparable harm is likely in the absence of injunctive relief, not just a mere possibility.  <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 22 (2008).  The State has a good argument that a well-publicized fireworks display at the Memorial for Independence Day weekend provides hard to quantify marketing benefits for the State, drives web traffic to the State's tourism sites, attracts visitors to the Memorial, and benefits the State's tourism industry and in turn its sales tax collections.  In short, the State argues that a fireworks display at the Memorial is good for the State and its tourism business and in turn the absence of one produces irreparable injury.  After all, the State would not be able to sue the Federal Defendants for money damages, so any injury to the State is irreparable.  <u>See Gen. Motors Corp. v. Harry Brown's, LLC</u>, 563 F.3d 312, 319 (8th Cir. 2009) ("Irreparable harm occurs when a party has no adequate remedy

34

at law, typically because its injuries cannot be fully compensated through an award of damages."). This argument of substantial irreparable harm is somewhat offset by the fact that the absence of entry of an injunction simply returns the State to the position it was in from 2010 through 2019 when no fireworks displays of any nature occurred at the Memorial. The likelihood of irreparable harm weighs in favor of an injunction, but of course a party may not justify injunctive relief to which it is not entitled simply because the injunctive relief would prevent irreparable injury to the movant.

The balance of harms and the public interest are the two final <u>Dataphase</u> factors that this Court must consider. "[W]hen the federal government or agency is the defendant, the final two factors can 'merge' into one." <u>Flandreau Santee Sioux Tribe</u>, 2019 WL 2394256, at *5 (citing <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009)). The balance of harms factor requires this Court to weigh the severity of the impact on the defendants should the injunction be granted against the hardship to the plaintiff should the injunction be denied. <u>See</u> <u>PCTV Gold, Inc. v. SpeedNet, LLC</u>, 508 F.3d 1137, 1145 (8th Cir. 2007). A fireworks event carries some risk of unvaccinated and unmasked attendees spreading the virus, perchlorate levels increasing in drinking water, a wildfire, disruption of typical visitation to the Memorial, and damage to the relatively new concrete pour at the Memorial. A fireworks event at the Memorial does cause some harm to the federal-tribal relationship that has been frayed through the years. Yet the public interest seems to favor the State in that most of the public—weary of COVID-19 restrictions and being unaware of the Tribal Defendants' concerns, perchlorate levels that increase in the Memorial's drinking water from fireworks displays, the impact that such a display has on regular visitation to the Memorial or its upkeep and construction project—would favor fireworks at the Memorial for Independence Day weekend. The Tribal Defendants and Lakota tribes, as well as those looking out for the long-term

35

interests of the Memorial, strongly disagree that a fifteen to thirty-minute fireworks display is worth disregarding the five legitimate bases the NPS cited for denial of the permit. Ultimately, there are strong arguments in both directions as to the balance of harms, and the public interest in the short-term appears to lie with having the fireworks display, whereas more long-term interests militate against it at least for this year.

## IV.    Conclusion

This Court is bound to follow governing law and apply the deferential arbitrary and capricious standard when evaluating whether to enjoin the NPS's permit denial. If the NPS had granted a special use permit to the State for fireworks at the Memorial for Independence Day weekend for 2021, this Court almost certainly would have denied a preliminary injunction to any group seeking to prohibit such a display from occurring. This Court fully understands the State's position and why this suit was brought, but under governing law, the State is unlikely to succeed on the merits of its claims and has not met the requirements for the sort of mandatory injunction or writ of mandamus sought. For the foregoing reasons, it is hereby

ORDERED that the State's Motion for Preliminary Injunction, Doc. 3, is denied.


DATED this 2nd day of June, 2021.

                         BY THE COURT:


                         ROBERTO A. LANGE
                         CHIEF JUDGE

36